02-10-472--474-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00472-CR

NO. 02-10-00473-CR

NO. 02-10-00474-CR

 

 


 
 
 rojelio a. trevino
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

Introduction

In
three points, Appellant Rojelio A. Trevino appeals his three burglary
convictions.  We affirm.

Procedural Background

The State charged Appellant in separate
indictments with burglarizing four habitations.  Each indictment contained an enhancement
paragraph alleging that Appellant had been previously convicted of two
felonies.  The jury found Appellant guilty of three of the four burglaries.  Appellant
elected to have the trial court assess punishment, and he pleaded true to the
enhancement paragraphs.[2]  The trial court found
the enhancement paragraphs to be true and assessed Appellant’s punishment at thirty-five
years’ confinement in each case, to run concurrently.  The trial court sentenced
Appellant accordingly.

Evidentiary
Sufficiency

In
his three points, Appellant challenges the sufficiency of the evidence to
support his three burglary convictions.

The
State’s Evidence

          This
appeal involves the burglaries of four homes located within a one-mile radius in
South Arlington on March 11, 2010, between approximately 6:00 p.m. and 8:30
p.m.  Although the jury acquitted Appellant of the fourth burglary, we discuss
it to provide context to Appellant’s arrest.

          The
Allison/Johnston Burglary

Edward Allison testified that he lived in a
house with his “surrogate father” Donnie Johnston and Johnston’s adopted son. 
On March 11, 2010, at approximately 5:30 p.m., Allison was working in his yard
when he saw an individual (whom he identified later that night and at trial as
Appellant) walking toward his front door.  Allison went inside, and he noticed
that the dogs (who always barked when someone rang the doorbell) were not
barking.  Allison estimated that it took Appellant “a good minute and [a] half”
before he rang the doorbell.  When Allison answered the door, Appellant asked
if he needed any yard work done.  Allison told him no, and Appellant left.  Shortly
thereafter, Allison left to meet Johnston at Johnston’s salon.

At
approximately 8:00 that evening, Allison and Johnston returned home to find that
someone had entered their home without their permission and stolen some of
their property—the garage door and back door were open, all the inside cabinets
were open, and both Allison’s and Johnston’s bedrooms had been ransacked.[3] 
Personal items were strewn inside and outside of the house, including in the
bushes around their home.  An expensive bicycle and several tools were missing
from the garage.  Allison was also missing a black leather motorcycle jacket with
a tan racing stripe down the sleeve.  The front door’s deadlock key was
missing.

          The
Simpson Burglary

          Matthew
Simpson testified that around dusk that same day, he returned home from grocery
shopping, parked his car in his garage, left the garage door open, and went inside
with a load of groceries.  As he returned to the garage, his dog ran out ahead
of him and started barking.  Simpson then “heard a noise, like somebody had
dropped something” and he saw an individual (whom he identified later that
evening and at trial as Appellant) standing at his tool bench.  Simpson did not
know Appellant and did not give him permission to enter his garage.  When
Simpson asked Appellant what he was doing, Appellant stated that he wanted to
borrow some tools to fix his lawnmower.  Then without taking any of Simpson’s
property, Appellant “walked away very fast.”

          The
Bonner Burglary

          At
approximately 7:15 that same evening, Andrea Bonner pulled her car into her
garage.  Bonner lived alone, and as she entered her kitchen, she heard noises
like someone was breaking into her home.  She screamed, “Get out of my house,”
called 911, returned to her car, backed down the driveway, and waited for the
police.  When she reentered her home with the police, Bonner discovered that
someone had entered her home without her permission by breaking her bathroom
window.  The intruder’s muddy footprints went from the bathroom down the
hallway to her bedroom doorway, and “you could see where there was a pivot step
where he must have — maybe at the time heard the garage door and turned as if
to leave.”  The evidence indicated that the intruder exited through the front
door, and the key to the front door’s deadbolt was missing.

          The
Johnson Burglary[4]

          Scott
Johnson testified that around 8:00 that same evening, he arrived home, opened
his garage, and found tools and other items strewn around his garage.  Inside
his home, several of the doors and windows were opened and clothes were
scattered all over the floor.  Johnson called the police, and while waiting
outside, he saw a truck pull up to a house down the street and a man jump out
and run between some houses.  When Arlington Police Officer Stephanie Doak
arrived, Johnson told her about the suspicious activity and also that the house
next door to his had been vacant for some time.  While they talked, a man
appeared between some nearby houses.  When Officer Doak ordered the man to
stop, he fled, and Officer Doak pursued.  Meanwhile, Johnson discovered some of
his missing personal property tossed throughout the neighborhood.  Inside the
vacant house, officers found a plethora of stolen items from homes in the
neighborhood, including some of Johnson’s property.

          The
Police Investigation

          Officer
Doak testified that she responded to Scott Johnson’s 911 call at approximately
8:20 p.m.  As Officer Doak spoke with Johnson and several of his neighbors, a
man came out from between some houses.  When one of the neighbors asked who he
was, the man ran in the opposite direction.  Due to the multiple reported burglaries
in the area, Officer Doak pursued the suspect while identifying herself as a
police officer and ordering him to stop.  The suspect slowed down long enough
to strip off the jacket he was wearing and then ran off among the houses.  Officer
Doak lost track of the suspect and radioed to other officers to set up a
perimeter to search for him.  Officers eventually located the suspect—later
identified as Appellant—curled up under a workbench in one of the neighborhood
garages.  Officer Jesse Lathrop testified that the suspect in the garage
matched the description of the suspect that had evaded Officer Doak.  Officers
Doak and Lathrop testified that Officer Lathrop arrested Appellant and that in
patting down Appellant officers found several items on his person, including a folding
knife, drug paraphernalia, and some jewelry.  Officer Lathrop testified that
Appellant also had two sets of keys in his pants pocket—two keys on a single
ring marked “kitchen” and a separate single key.[5]  Officer Doak testified
that she subsequently went to complainant Bonner’s home, and Bonner identified
the separate single key as the one that had been stolen.[6]

          Officer
John Welch testified that he responded to the 911 call regarding the burglary
at Allison and Johnston’s home.[7]  That same evening,
Officer Welch learned that officers had detained a suspect in the burglaries,
and he took Allison to the suspect’s location.  Allison identified Appellant as
the person who had come to his door a couple of hours prior to the burglary. 
Allison also identified the set of keys found in Appellant’s pants pocket as
being taken from the home.  The police also returned to Allison his stolen
black leather jacket, which Appellant shed during his flight from Officer Doak.

          Officer
Thomas McCloud testified that he responded to Officer Doak’s request to
establish a perimeter around the South Arlington neighborhood.  Officer McCloud
detained a “possible suspect”; however, when this suspect was presented to
homeowner Simpson (after instructing Simpson about identification protocol),
Simpson stated that the suspect was not the intruder in his garage who claimed
to be borrowing tools.[8]  Officer McCloud
subsequently took Simpson to the location where officers were detaining
Appellant, and Simpson identified Appellant with “a hundred percent” certainty as
the intruder in his garage.

Appellant’s
Evidence

          Appellant
did not testify, and he did not present a case in chief.  On cross-examination,
Appellant’s counsel elicited from Officer Doak that one of the offense reports
listed Appellant’s address as “Homeless.”  Officer Doak further explained,
however, that Appellant did not have any identification when he was arrested but
that he said he lived in Haltom City.  Appellant’s counsel also elicited from
Officer Doak that Appellant told her he “did lawn work.”  In his closing
argument, Appellant’s counsel raised the theory that Appellant had been homeless,
looking for work, and merely picked up the property, not knowing it was stolen.

Standard
of Review

In
our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Isassi v.
State, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).  This standard gives
full play to the responsibility of the trier of fact to resolve conflicts in
the testimony, to weigh the evidence, and to draw reasonable inferences from
basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Isassi, 330 S.W.3d at 638.  The trier of fact is the sole
judge of the weight and credibility of the evidence.  See Tex. Code Crim.
Proc. Ann. art. 38.04 (West 1979); Brown v. State, 270 S.W.3d 564, 568
(Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075 (2009).  Thus,
when performing an evidentiary sufficiency review, we may not re-evaluate the
weight and credibility of the evidence and substitute our judgment for that of
the factfinder.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App.
2007).  Instead, we Adetermine whether the
necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.@  Hooper
v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the verdict and
defer to that resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Isassi,
330 S.W.3d at 638.  Circumstantial evidence is as probative as direct evidence
in establishing an actor’s guilt.  Isassi, 330 S.W.3d at 638; Hooper,
214 S.W.3d at 13.

Applicable
Law

A
person commits a burglary if, without the effective consent of the owner, he
enters a habitation and intends to commit theft, attempts to commit theft, or
commits theft.  See Tex. Penal Code. Ann. § 30.02.  A suspect’s identity
and burglarious entry into the habitation may be proven by circumstantial
evidence.  See Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)
(identity); Smith v. State, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th
Dist.] 2001, pet. ref’d) (identity); see also Gilbertson v. State,
563 S.W.2d 606, 608 (Tex. Crim. App. [Panel Op.] 1978) (entry); Tabor v.
State, 88 S.W.3d 783, 786–87 (Tex. App.—Tyler 2002, no pet.) (entry).  Unexplained
or unreasonably explained possession of recently stolen property by the
defendant may raise an inference of guilt.[9]  See Rollerson v.
State, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007); Poncio v. State,
185 S.W.3d 904, 905 (Tex. Crim. App. 2006); see also Chavez v. State,
843 S.W.2d 586, 588 (Tex. Crim. App. 1992)  (“This rule of sufficiency is
necessarily based upon a belief that those who steal property usually remain in
possession of it for some time afterwards and that persons acquiring property
honestly during such an interval are typically willing to explain how they came
by it.”).

Analysis

          Regarding
the Allison/Johnston and Bonner burglaries, Appellant contends that no
evidence placed him inside the homes, and he emphasizes that fingerprints
lifted at the scenes did not match his prints.  Appellant also contends that
“no evidence specifically identified [him] in possession of any of the property
stolen from the house[s].”[10]

Within
an approximate three-hour period, four homes within a one-mile radius were
burglarized.  The same night as the burglaries, Appellant was wearing (and
discarded while in flight from the police) Allison’s stolen leather jacket.[11] 
After the police found Appellant crouched under a workbench in a neighborhood
garage, homeowner Simpson identified him as the intruder in his garage earlier
that evening.  Appellant also possessed house keys that both Johnston[12]
and Bonner[13] identified as having
been stolen from their homes.[14]

Appellant’s flight from
officers and unexplained possession of recently stolen property in the
proximity of the burglaries supports an inference of guilt.[15] 
See Poncio, 185 S.W.3d at 905 (“Appellant’s exclusive and
unexplained possession of property recently stolen in a burglary in conjunction
with the fact that he pawned the property very close to the burgled home are
sufficient to support his burglary of a habitation conviction.”); see also
Clayton v. State, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (holding
that flight can give rise to an inference of guilt).  The reasonableness of the
explanation given by Appellant’s counsel at trial—that Appellant found the
property—was a fact issue the jury resolved against him.  See generally
Havard v. State, 972 S.W.2d 200, 203 (Tex. App.—Beaumont 1998, no pet.).  Despite
the lack of fingerprint evidence, the evidence supports Appellant’s burglary
convictions in these two cases.  See Rollerson, 227 S.W.3d at 725
(holding that the defendant’s possession of items recently stolen in a burglary
was legally sufficient evidence to convict him of the burglary, even though
there were no witnesses); see also Rogers v. State, 929 S.W.2d
103, 108 (Tex. App.—Beaumont 1996, no pet.) (sustaining burglary conviction
despite the lack of physical evidence, including fingerprints, linking the
appellant to the burglary of a habitation); Lemons v. State, No.
02-10-00301-CR, 2011 WL 3795266, at *5–6 (Tex. App.—Fort Worth Aug. 25, 2011,
no pet.) (mem. op., not designated for publication) (upholding appellant’s
burglary conviction in part because the police found recently stolen property
in his pockets).

          Regarding
the Simpson burglary, Appellant asserts that the State failed to prove
both (1) that he entered a “habitation,” because the evidence established that
he entered Simpson’s garage (which Simpson never described as being attached to
his home) and (2) that he intended to steal the tools because the evidence
established only that he intended to borrow them.  A “habitation,”[16]
however, includes “each separately secured or occupied portion of the
structure” and “each structure appurtenant to or connected with the
structure.”  Tex. Penal Code Ann.  30.01(1)(A), (B).  Courts have construed these
definitions to include both attached and unattached garages.  See Darby
v. State, 960 S.W.2d 370, 371–72 (Tex. App.—Houston [1st Dist.] 1998, pet.
ref’d) (holding that under burglary statute an unattached garage is a
“structure appurtenant to” a residence); Johnson v. State, 844 S.W.2d
872, 874 (Tex. App.—Amarillo 1992, no pet.) (rejecting contention that garage
attached to house did not constitute habitation).  Moreover, in a burglary
prosecution, the specific intent to commit theft may be inferred from the
circumstances.  See McGee v. State, 774 S.W.2d 229, 234 (Tex. Crim. App.
1989), cert. denied, 494 U.S. 1060 (1990); Goodeaux v. State, 269
S.W.3d 730, 734 (Tex. App.—Beaumont 2008, no pet.).  Here, the jury could
reasonably find that Appellant intended to commit theft when he entered
Simpson’s garage without Simpson’s permission at nightfall and then departed
quickly when his efforts were thwarted by Simpson and his dog.[17] 
See Brown v. State, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (“[T]he
presumption of an intent to commit theft arises from the nonconsensual
nighttime entry of a home or building.”), cert. denied, 541 U.S. 938
(2004); see also McMillian v. State, 873 S.W.2d 62, 64 (Tex. App.—Tyler
1993, pet. ref’d) (holding that circumstantial evidence of entry included
defendant’s hasty retreat in car from burglary scene).

          Viewing
all of the evidence in the light most favorable to the jury’s verdicts, and
deferring to the jury’s authority to draw reasonable inferences from basic facts
to ultimate facts, we conclude that the evidence was sufficient to enable the
jury to rationally find, beyond a reasonable doubt, that Appellant committed
each of the three burglaries.  We overrule Appellant’s three points.

Conclusion

Having
overruled Appellant’s three points, we affirm the trial court’s judgments.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER, MEIER, and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  June 28, 2012









[1]See Tex. R. App. P. 47.4.





[2]Because Appellant pleaded
true to the habitual offender notices alleged in each offense, his range of
punishment for the second-degree burglaries was twenty-five to ninety-nine
years or life.  See Tex. Penal Code Ann. '
12.42(d) (West Supp. 2011), '
30.02(c)(2) (West 2011).





[3]Johnston’s son remained
asleep in his bedroom throughout the offense.





[4]The jury acquitted Appellant
of this offense.





[5]Officer Doak testified
that in patting down Appellant, officers found several items including a set of
house keys.  She also testified that there was a set of house keys in the
jacket Appellant had discarded as he fled.





[6]Although Officer Julianne
Armendarez lifted two latent fingerprints from Bonner’s front glass door, the
prints did not match Appellant’s known prints.





[7]Although Officer Welch
lifted latent fingerprints from certain pieces of property located inside and
outside the home, none of the prints were of sufficient quality to compare to
Appellant’s known fingerprints.





[8]That suspect was
eventually arrested and charged with possession of methamphetamines.





[9]Mere possession of stolen
property does not create a presumption of guilt; rather, it can support an
inference of guilt.  Hardesty v. State, 656 S.W.2d 73, 76 (Tex. Crim.
App. 1983).  An inference is a conclusion reached by considering other facts
and deducing a logical consequence from them.  Hooper, 214 S.W.3d at
16.  “[J]uries are permitted to draw multiple reasonable inferences from the
evidence (direct or circumstantial) . . . .”  Id.





[10]Appellant asserts that
“no evidence directly identified the jacket as the one stolen from the Johnston
home” and that nothing specifically identifies the keys taken off him as the
specific keys stolen from the houses.





[11]Allison testified that
his black leather motorcycle jacket with a racing stripe on the sleeve was
stolen and that the police returned it to him.





[12]Officer Welch testified
that Johnston reported a missing key from “inside of the front door where they
always lock the door and leave the key in its place” and that Johnston’s key
was recovered that night.  Officer Welch explained that “[t]here was a group of
keys that was taken from the suspect and [Johnston] identified one of the keys
as the one that fit in the door.”  Johnston testified that the deadbolt key to
his front door was stolen and that the police returned it to him.





[13]Officer Doak testified
that after finding house keys on Appellant’s person, she “went to one of the
previous burglaries and showed her the house keys.  They did belong to her.”





[14]To the extent there was
conflicting evidence as to whether both sets of house keys were found in
Appellant’s pants pocket or whether one set was found in his pants pocket and
one set was found in the jacket he discarded, we must presume that the
factfinder resolved any conflicting inferences in favor of the verdict and
defer to that resolution.  See Jackson, 443 U.S. at 326, 99 S.
Ct. at 2793; Isassi, 330 S.W.3d at 638.





[15]See Hardesty,
656 S.W.2d at 76 (“If a defendant is found in possession of recently stolen
property and at the time of arrest fails to make a reasonable explanation
showing his honest acquisition of the property, the factfinder may draw an
inference of guilt.”); Clark v. State, No. 05-07-01264-CR, 2009 WL
580868, at *2–3 (Tex. App.—Dallas Mar. 9, 2009, no pet.) (not designated for
publication) (“Because he did not make his explanation at the time he was first
called upon directly or circumstantially to do so, we conclude the State was
not required to refute his explanation made for the first time at trial.”).





[16]“‘Habitation’ means a
structure or vehicle that is adapted for the overnight accommodation of persons
. . . .”  Tex. Penal Code Ann. § 30.01(1) West 2011.





[17]Simpson testified that he
found Appellant in his garage at “dusk, I think.  But by the time he walked
away it . . . already had gotten dark.”